Thank you, Your Honor. May it please the Court, my name is McChristy Adams. I'm here on behalf of the appellant Grand Canyon Trust. This case, as you know, is about the Bureau of Reclamation's operation of Glen Canyon Dam. And there are four aspects of those operations at issue in this case. Two of them, the hourly operations and the daily operations, were approved in the 2009 biological opinion and the 2010 incidental take statement. Yes, I think you've been very candid. And we applaud your efforts in determining which issues are moot and which you claim still to survive. So why don't you go directly to the ones that you claim still survive, which I think has to do with a review of the recovered goals and of the operation agreement. I appreciate that, Your Honor. One note I would make about the claims that we agree are moot is that we do request that the portions of the district court's opinions that address the biological opinion and the incidental take statement be vacated. And for the reason that the federal agencies prevailed below, the actions that have caused these claims to become moot were out of the trust control, and the trust has now been prevented from appealing them. Go ahead. Now, the other two aspects of dam operations, as you note, that are at issue in this case are in the annual operating plans. Now, the annual operating plans are subject to the Endangered Species Act and the National Environmental Policy Act because they are discretionary agency decisions that may have impacts on the endangered humpback chub and the other resources of the Grand Canyon. Now, specifically for the Endangered Species Act, the annual operating plans determine the amount of water that will be released over the course of the year and the amount of water that will be released each month. Period, no matter what happens. No matter if we have a 1,000-year storm that fills up the thing, no matter if we have a 1,000-year drought that eliminates it all. There can't be any change in the annual operating plan. There can't be any change in what's done after that. Is that right? There can be one change, Your Honor. The system is built for those sorts of eventualities, the unforeseen. And so there is a provision, and it's noted in the 2008 annual operating plan in the record at 1,100, and it's described in more detail at page 898 in the record. And it provides for, based on the April forecast, the agency can go through a similar process that it goes through with the original annual operating plan, seek input from the states, seek input from the other stakeholders, and make that change halfway through the year, if that is appropriate. So yes, the system is built both for the flexibility of being able to make that change, but that does not undermine the fact that there is a decision made at the beginning of the year. And that decision has consequences. And it has consequences on the endangered humpback chub downstream. Now, reclamation in making that decision is required to use discretion. It's required to weigh numerous factors. Required to use discretion as to what factors? I was under the impression that the only factors that they could use discretion on is dependent on climatological forecasts of how much water there would be. No, that is not correct, Your Honor. All right, you tell me why I was wrong. Well, in the annual operating plan, they actually list the factors, and that's at 1101 in the record. And it states that the annual operating plan was developed with appropriate consideration of the uses of reservoirs for all purposes. So that includes flood control, river regulation, consumptive uses, power production, water quality, recreation, and enhancement of fish and wildlife, and other environmental factors. So reclamation in the annual operating plan acknowledges that it's explicitly required to consider those factors. And the point of these plans, from the Grand Canyon Protection Act perspective, is, in fact, to improve or maintain and protect the resources of the Grand Canyon. And in the Grand Canyon Protection Act, it sets forth the requirement that the agency consult with the basin states and with other stakeholders. And it specifically says that this process is required to assist the Secretary in exercising such discretion. You know, I'm curious. This really isn't a, it's probably irrelevant also. But if indeed you are correct, and the full NEPA process has to be gone through, and the SA process, each year for the annual operating plan, does one ever wind up really implementing the annual operating plan? It strikes me that litigation of this sort extends for quite a while. You know, they talk about evading review, but there's also a question of evading action. How does that work? If every year, and then I think you said that in mid-year, it might be that some change is going to have to be made. And so I guess another review doesn't? And if so, how do you ever actually do anything in the real world? I mean, maybe the answer is we don't want them to do anything in the real world, but that's a different question. That is not the answer, Your Honor. It's actually not unusual for an annual action to be consulted upon by the Endangered Species Act or by the National Environmental Policy Act. The Anbang Court in Karuk tribe just found several weeks ago that a notice of intent in the mining context, which is an annual action, excuse me, requires consultation. And in this case, the framework is already set up. The Grand Canyon Protection Act requires the agencies to do some consultation process with the states and with particular stakeholders. And that process starts as early as June. If you look at the 2008 plan, at 1095 in the record, it states that they had at least four conference calls or meetings. And they started in June of that year, prior to the annual operating plan. So the framework is already in place. And this is, in fact, an agency decision that reclamation may adjust in order to benefit the endangered humpback chub. So it is required to comply with the Endangered Species Act for that decision. And it's a decision that's made nowhere else. It's not a decision that's on top of other decisions. It is a decision that has never been made. And it is critical for the humpback chub. For example, in the record, the US Geological Survey issued a report in 2010. And they summarized the sciences, stating that current and previous studies show that more stable and relatively lower monthly volume releases are most effective at limiting erosion of sandbars, retaining new sand, and improving access to backwaters for fish. And that can be found at 1769 in the record. That sounds like an attack on the whole underlying decision in the first place, that decided on MLFF. That sounds an awful lot like what you're saying. You guys really shouldn't be doing MLFF. You should be doing, what is it, SASF? Well, there's two separate Is that what you seem to be saying? There's two separate issues. But you just said, really, you're quoting and saying, yes, they should be doing SASF. And there are these surveys that said that would be a really good idea. Am I wrong? With all due respect, Your Honor, there's all of the operations, they come down to sediment and come down to sand. So it could be that, I mean, there are many overlapping and interlocking issues here. But there are two separate decision-making processes governing different operations of the dam. The modified low fluctuating flows that you refer to controls the daily operations and the hourly operations. And Reclamation has argued in its briefs that that's where the decision is made, on the monthly volumes as well. But if you look at the operating criteria is set out in the Federal Register Notice from 1997. And it's also summarized in the agency's briefs. And it goes through and makes decisions on hourly operations, daily operations, which means the minimum flows, the maximum flows, the maximum fluctuations over the course of the day. But it does not say anything about the monthly releases. And those monthly releases also have an impact on the humpback chop. For example, the Reclamation could decide to release lower releases during certain times of year, which would mean lower fluctuations, even under MLFF. And that would retain better habitats for the fish during certain times of year. And then they could release more water at other times of year. So they have the ability to make decisions that impact how the chub survives or thrives that year. Now, the National Environmental Policy Act applies to the annual operating plans under the same analysis. The NEPA analysis would also address the other resources of the Grand Canyon, which also are dependent in large part on sediment. But they include the beach building for the recreationists, the boaters that come down the river. They would weigh the power interests, the water supply interests, and other impacts to the human environment through a NEPA process. So the annual operating plans are discretionary agency decisions. They can be changed to benefit downstream Grand Canyon resources and the endangered chub. And they're subject to the Endangered Species Act and the National Environmental Policy Act. And I'd also like to address the 2009 recovery goals. We challenged the recovery goals under the citizen suit provision of the Endangered Species Act. The citizen suit provision provides jurisdiction to the courts when a plaintiff alleges that the secretary has violated a mandatory duty under section 4 of the Endangered Species Act. Now, here we allege that the service violated its duties to provide for notice and comment, to provide time and cost estimates for the intermediate actions leading up to through a recovery plan, and to provide the best available science, which is implemented through the peer review policy. There's no dispute here that the service did not subject the recovery goals to notice and comment or to peer review. The district court held that those duties had not yet arisen because the goals are labeled to be a draft set of goals. But the service, despite their label, is implementing them as if they are complete. It implemented them in a very specific way in response to the district court's finding several years ago that the service was lacking a recovery analysis in the 2008 biological opinion. And the service isn't before us. It is not before you, no. Sorry. So if it were, then I suppose one could address it. And if recovery plan stuff is mixed up in it, one could address whatever it was that's in it, right? The claim that gets Is that at all clear? It wasn't very clear to me. You've got A, recovery plan. You've got B, biological opinion, which has taken some stuff out of recovery plan into biological opinion, OK? So they say, well, we haven't really quite decided on what we want the recovery plan to be. That's A, so that's not settled yet. And you say, uh-huh, but you put the information over here in B, so we should be able to attack the information in B. And by the way, that just happens to be the same stuff that was in A. Yes? Yes, but But we're not dealing with the 2008 biological opinion at this point. The recovery goals are still being implemented. They were implemented in the 2011 biological opinion, which is But we don't know that because that's not in front of us, correct? That is correct. It sounds to me like And if they are there, then when you attack the biological opinion in 2011, I suppose you will attack the recovery goal used in there. Is that correct? Well, it's definitely possible, Your Honor. But that doesn't change that the claim against the recovery goals now is still ripe. The ripeness, if that's what you're getting at, of the recovery goals, we have alleged a procedural harm, that the agency has failed to comply with its mandatory duties. I know, and that mandatory duty supposedly comes up when they've got something ready to be commented on, et cetera. True? I think they do. The Ninth Circuit has previously held that a challenge to a document for procedural harms under the ESA does not require that you also challenge the document in which it is implemented. So the fact that we are challenging procedural harms means that this claim is ripe for review by this Court, regardless of whether the document in which it has been implemented is in front of this Court. And your procedural harm is that they have not yet asked for public comment, et cetera, et cetera, regarding the recovery goals. Am I right? That's correct. And they are required to do so as soon as they have a little piece of paper that says, we're going to start working on recovery goals? No. Not yet. No. So they don't have to do it then. So when do they – when are they required to do this or cause you procedural harm? As soon as they implement those goals. So then they have to implement the goals before you have a right to a procedural harm. You just said they didn't have to. I'm sorry. It's – I agree. Either my notes are misleading or you have been misleading me. I will try again. The – we are alleging a procedural harm. It's – those mandatory duties would not arise, as you know, Judge Fernandez, when a document is truly in draft form. But this document, while it is called a draft, is being implemented as if it is a complete document. So the fact that they have not yet completed their mandatory duties means that it's an – it's illegal, but it doesn't mean that it's not complete. The separate question is, do you also have to challenge the – the action in which the goals have been implemented? And the answer to that is no. And I would point you to Citizens for Better Forestry versus USDA, 341F3R961, which lays out the idea that when an agency – or, I'm sorry, when a plaintiff is alleging a The plaintiff must – need not also challenge the document in which it is being implemented. It is enough that it is being implemented here. The – and that is what causes these mandatory duties to arise. If you have no further questions, I'll reserve the rest of my time for rebuttal. Thank you. That's fine. May it please the Court, I am David Shulton. I represent the federal appellees, Bureau of Reclamation and U.S. Fish and Wildlife Service. I'll be sharing about three minutes of my time with Karen Kwan for the interveners. Also with me at council table is from the solicitor's office, Robert Snow. So I'll deal first with the question about the annual operating plans and then the recovery plan issue after that. And I think that with the annual operating plans, of course, there's no dispute in this case that Section 7 of the Endangered Species Act and NEPA both apply to the operation of Glen Canyon Dam. The question is when do they apply. And they apply when the agency makes a discretionary determination that could affect the chub and makes decisions about the protective conditions that it might need to impose. Now, the agency has complied with those statutes on numerous occasions. The critical thing that the trust is concerned about now is the flow regime. And in particular, they have advocated the seasonally adjusted steady flows under which you wouldn't have as high of flows in the summer months. That decision, the Bureau's decision, was made in 1996. After doing a full environmental impact statement in 1995, the record of decision in 1996 decided that it would not adopt the seasonally adjusted steady flow alternative that was advocated by the trust, but instead the modified low fluctuating flow alternative, which does permit the historic pattern of monthly releases at the dam under which the releases are higher in the summer and the winter when the power demand is higher. And so the NEPA compliance was done then, Endangered Species Act compliance was done then. The annual operating plans simply report. They report on the releases for the prior year, and they predict what the releases will be in the upcoming year. So that everybody in the basin who has an interest will know what they can probably expect will be the pattern of releases. Now, of course, that depends on, you know, the hydrology, so it is just a prediction, can be changed during the year. But the annual operating plans are not where the agency makes affirmative discretionary decisions about should we change this historical pattern of flow releases where the flows are higher in the summer and winter. It's just not done in the annual operating plans, which are required, you know, by statute. There's a 1968 statute which says, beginning January 1st, 1972, and yearly thereafter, the Secretary shall transmit to the Congress and to the Governors of the Colorado River Basin States a report describing the actual operation under the adopted criteria for the preceding combat water year and the projected operation for the current year. That's 43 U.S.C. 1552, subsection B. So Congress recognized that it's the criteria, it's the adopted criteria that determine the pattern of releases. This simply requires a yearly report so that Congress and the Governors know what to expect. And so... Judge Gould, if I could interject a question, please. So you're saying that the annual reports are not really a decision document? Correct. Correct. They are a reporting document. Then how does that square with the argument Appellant made about the recent Karuk case involving ESA issues? But can you respond to that? Yes. The Karuk case said that what Section 7 turns on is whether there is an affirmative discretionary decision involving what sort of protective conditions to attach to that decision to protect the endangered species. And so as a report, it's not an affirmative discretionary decision to do something. It's simply reporting on how previous decisions about the criteria will lead to certain flows during the year. So in Karuk Tribe, it was a case where the National Forest Ranger made a decision about these notices of intent to mine, to carry out a certain kind of mining. And it was at that point that the Forest Ranger could say, should we allow this mining to occur or not? And if we do, should we condition it to protect certain habitat? That was the one chance the Forest Service got to carry out that protection. So that sort of decision is affirmative. It's discretionary because the Forest Service can impose conditions. And so Section 7 applies. That's very unlike the yearly annual operating plans, which don't represent that kind of decision-making process. As the district court recognized here, really the only annual operating plan that the plaintiffs challenged was the 2008 annual operating plan. May I interrupt you for just a second? As I understood Ms. Adam, when she was citing excerpts of Record 1101, the adoption of the annual operating plan had to take into consideration several purposes. And she recited a series of considerations of environmental import. And my pen wasn't quick enough to grab them all. But what you're saying, as I understand it, is that the agency doesn't have the discretion to consider anything other than what happened last year, what's the rainfall going to be this year, what's the flow going to be this year. Is that right? That's right. The environmental considerations go into the criteria and determining the criteria. But that's not decided on a yearly basis. That was decided basically in 1996. And then there have been some changes since then. In 2007, for instance, there were some changes to the criteria to better balance the operations of Glen Canyon Dam and Lake Mead. And some changes to criteria were made then. And so they did another environmental impact statement and consulted with the Fish and Wildlife Service. But it is the criteria which are the key decision. And that's when the compliance takes place. So I do want to stress that we certainly comply with these statutes. It's simply at the time when affirmative discretionary decisions are made. And it truly would be impracticable to do a NEPA and an Endangered Species Act compliance every year for annual operating plans. Congress wanted these to be promulgated yearly in January so that everybody in the basin knows what's going to happen. And if you had to do NEPA and Endangered Species Act compliance each year, that simply wouldn't work. But the Bureau now is beginning a new environmental impact statement process under which the question of flows can again be considered. And the Grand Canyon Trust can again raise these issues about the steady flows. But it's a multi-year process. It's called the Long-Term Environmental Management Plan process. And by nature it takes several years. So it just wouldn't work to do it with the plans. But I think the key thing is that the congressional language which requires these annual operating plans recognizes that they are simply reports. And under both the Endangered Species Act precedents of this Court and the NEPA precedents, including the Upper Snake River case under NEPA, which indicates that simply where the agency is simply running a dam, operating at a dam, under previously determined criteria and is not changing those criteria, that's simply maintenance of the status quo and doesn't trigger NEPA duties. So unless there are other questions about the annual operating plans, I'll move on to the recovery plan issue. And the district court here correctly found that it couldn't review the draft recovery goals since they have not been given final approval and indeed have not gone through some of the steps that would be required for such approval, such as notice and comment. Nor is a mere draft. Do they affect the rights of parties or otherwise have legal consequences? So the draft recovery goals meet neither of the tests for final agency action under the APA. They're not the consummation of the agency process, nor do they affect rights. The trusts here is simply, you know, pointed to the fact that the recovery plan goals were cited to in the 2008 and 2009 supplemental biological opinions, but that's simply, you know, reliance on the science that's in the recovery, draft recovery goals and doesn't make the draft final. For the draft to become final, the Fish and Wildlife Service has to go through the statutory procedures, which it has not completed yet. And contrary to the plaintiff's argument, the draft goals are not being implemented in a way that makes them final. Under Section 4F of the Endangered Species Act, a recovery plan would only be implemented if the Fish and Wildlife Service were to determine that it's appropriate to delist a species. That's basically the function of a recovery plan, is to try and get everyone to the situation where the species can be taken off the endangered species list because it's recovered. But that's not happening. No one has proposed to delist the humpback chub. So it's not like this draft recovery goals is being implemented. And the district court also was correct to reject the argument that the trust could bring some kind of claim under the citizen suit provision of the Endangered Species Act itself. That's a provision which allows a claim that some non-discretionary duty under Section 4 of the Act is not being carried out. But that's really not the nature of the trust's claim. The trust is trying to get review of the draft recovery goals, as I understand it. And there's simply no non-discretionary duty that attaches at this point while it's still a draft. If you simply brought the science over into the biological opinion, I suppose you'd agree they can attack the science if they want, correct? They can, yes. When they were attacking the 2008 and 2009 biological opinion, they could perfectly well attack the science behind the Fish and Wildlife Service's conclusion in the draft that a certain level of certain population of fish represented recovery. And they can, again, challenge it if they challenge the 2011. I suppose if the courts finally decide the science is lousy, that will have some effect on what you do in the recovery goals eventually, no? Correct. And that awaits a, you know, a live controversy about a particular biological opinion that in turn relies on the recovery goals. That may occur with the 2011 or they may finalize the recovery plan before then. It's hard to tell. But at some point, if the science is used in a way that injures the plaintiff, they will be able to challenge that. And right now, counsel, at this time, to the extent the recovery goals are incorporated in the biop, that's moot, right? That is moot, right. Because I think we all agree that the 2008 biop and its 2009 supplement, those challenges are moot because it's been superseded by the 2011 biop. So to attack that science, you have to have a live controversy about a current biological opinion. And the trust, I guess, hasn't decided whether they're going to challenge the 2011 biop. But there's no live controversy at this point that could raise that issue about the quality of the science underlying those recovery goal conclusions. Thank you. Unless there are other questions, I'll cede the rest of my time to Ms. Kwan. No questions. Good morning. May it please the Court. My name is Karen Kwan, and I'm coordinating counsel for the intervener group and appearing on behalf of their behalf today. Interveners participate in this appeal to protect their respective interests in the current and future operation of Glen Canyon Dam and the Colorado River resource. I specifically want to focus solely on the, briefly, on the Grand Canyon Trust requested remedy concerning the AOP claims. The trust asks this Court to require that the Reclamation and the United States Fish and Wildlife Service perform ESA consultations and NEPA reviews on each annual report, which is commonly referred to as the annual operating plan. In addition to misapplying the standards for requiring ESA and NEPA reviews, as Mr. Shilton has argued today, this request presents significant practical challenges for this Court to consider. First, performing such reviews would be an unnecessary waste of time and resources. Ignoring the multitude of facilities throughout the Colorado River Basin that are located myopically on the Glen Canyon Dam itself, the AOP in no manner decides actual operation of the dam. Rather, application of actual hydrology to operating criteria that were previously subjected to ESA and NEPA compliance are what determine the actual releases from the dam. The AOP, on the other hand, reports on the past and projected operations based on modeling of hydrology, and they're frequently changed based on actual hydrologic conditions throughout the year. Therefore, review of projected operations as reported in the AOP would be superfluous and a waste of time. Second, to the extent review of the hydrologic information and the systematic information that's contained in the AOP, to the extent that could somehow be reviewed and then thereby allowed to change the operating criteria, the decisions that are made, and the fonzies or the biological opinions or the like, it would effectively negate the consistency that's relied upon in operating the reservoirs. It would introduce unnecessary uncertainty as to the relationship and purpose of the environmental reviews performed on the river. It would also destabilize the legal framework for the reservoir operations consistent with the law of the river, which we refer to as an amalgamation of laws governing reservoir operations and the legal rights between the engineering entities and the Grand Canyon Protection Act. By that I mean Congress requires the Secretary of the Interior to balance a myriad of interests on the river. The Secretary has pursued this balance by developing and implementing operating criteria that are subject to rigorous environmental reviews. Interveners and other stakeholders rely on these operating criteria to help them determine what the consistent operation of the reservoirs would be and to plan for their water supply and energy supply needs for the upcoming year. By allowing the annual operating plan or by allowing environmental review of the annual operating plan to upset those decisions, they would, in effect, be determining, undermining what could be determined as water availability and informing, undermine the water availability determinations and also the decisions necessary to inform respective planning for the upcoming year. Finally, if reclamation were required to annually assess potential impacts and species status associated with operating the dam, independently of the existing reviews that have already been performed, it would be a futile action. Judge Fernandez hit the nail on the head when he was asking Attorney Adams the question. Basically, by the time it would take to assess the systematic and hydrologic information contained in the annual operating plan, the report would be outdated. And as Mr. Shilton has pointed out, the Congress and the governors of the seven Colorado River Basin states expect those reports to be done on an annual basis so that they can plan and prepare for the upcoming water year. So it's important to also note that the interveners rely on those annual reports to develop recommendations and informing their boards and constituents as to the actions that they may take for the upcoming year. And likewise, the ALP memorializes the actual actions that will be taken operating conditions for each year's placement of water diversions in the lower basin. And by that I mean the lower basin cannot submit a water order for water to be delivered to California, to Nevada, to Arizona or their water entities unless until the annual operating plan is provided because that is where the actual or the projected hydrology combined with the operating criteria for that year are memorialized so that we know what, according to that criteria, their operation should be for Lake Powell and Lake Mead and the other various facilities on the river. There's a lot of detail and nuances to the reservoir operations, and that's why there's consultations on the annual operating plan each year. We meet in – there's a Colorado River Water Management Group and there's an Adaptive Management Work Group, and both consult to try to identify how those criteria are being applied consistent with the existing laws. That does not mean they're making a decision. Kennedy, your time is up. Thank you. Thank you. Your Honors, there's just two. With respect to Ms. McQuown's last point regarding impracticability of having the AOP annually revised or reviewed for environmental purposes, do you have any suggestion as to how those two needs could be accommodated? Should we say you have 10 days to have your environmental review of the AOP? I'm sorry. I don't understand. Well, she's saying that if, taking off on Judge Fernandez's question, if further review of the AOP can be done for environmental purposes, right, it means that the process will never approve any AOP because it will take a year to review it. Are you proposing that this Court consider, say, 7 days or 10 days to do it? No, Your Honor. We wouldn't ask this Court to put any sort of restriction on how long it would take. So if we don't do that, how can the AOP be used? It will always be delayed to the point of denial. There's no evidence in the record to suggest that's true. And the Endangered Species Act requires consultations generally to be completed in 90 days. And the Karuk Tribe case also addressed the burden that would be placed on, in that case, the notices of intent in the mining context, which are also annual decisions when a proposed mining project is proposed to them. But, counsel, in that case, am I right that the notice of intent process, it wasn't an annual operating report? No, that's correct. It was not. It's a notice of intent is where, you know, individual proposes to mine in a particular place in the forest. And it is generally, it needs a quick turnaround because they're proposing to mine usually that season, that summer. They come up year after year after year in that context. And I would like to, if I might, in my last 20 seconds, address, sort of take a step back and look at this in the big picture. Reclamation and the interveners talk about the flow regime and dam operations, but there are two very different aspects to the flow regime. The modified low fluctuating flows, which were determined in the operating criteria, only determine the daily operations and the hourly operations. Those are summarized at pages 17 and 18 of Reclamation's answering brief. There is nothing in there that determines the monthly volumes. And I think the interveners highlighted that by suggesting just how heavily they rely on these decisions. These are different decisions. They determine how much water is released each month as opposed to what the fluctuations are going to be, how much is going to be released on a daily or hourly basis. They're entirely separate decisions that both have impacts on the Grand Canyon and on the endangered chub. But this is the time that the decisions are made. Thank you very much. Thank you, Your Honor. The case of Grand Canyon Trust v. United States Bureau of Reclamation is submitted. And the last case on the calendar, USA v. Griffin, is submitted on the briefs. This Court will stand in adjournment until tomorrow morning at 9.30 a.m. Thank you very much.
judges: Fernandez, Gould, Bea